IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action No. 25-148 (MN) |
| | ) | |
| PAYTON DRIVER, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Benjamin L. Wallace, United States Attorney, Olivia Duke, Assistant United States Attorney, Wilmington, DE – attorneys for Plaintiff

Megan Davies, LAW OFFICES OF MEGAN J. DAVIES, Wilmington, DE – attorney for Defendant

August 12, 2026
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Police officers questioned Payton Driver while she was in bed. The questioning was friendly at first but quickly grew more intense and accusatory. At around eighteen minutes into the interview, the officers told Driver that she could either provide helpful information or be handcuffed, jailed, and criminally charged. For the reasons discussed in this Opinion, *Miranda* warnings were owed to Driver at this point in the interrogation, and her ensuing statements were involuntary.

Driver moved to suppress her statements in the interrogation and derivative evidence ("the Motion"). (D.I. 10). The government has opposed the Motion. (D.I. 11). The Court held oral argument on May 20, 2026. (D.I. 12).

## I.    BACKGROUND

In April 2025, an informant told the New Castle County Police Department ("NCCPD") that a woman named Payton Driver had purchased a firearm from Millers Gun Center for a non-citizen who was unlawfully present in the United States. (D.I. 10 at 1; D.I. 11 at 1-2). This alleged criminal transaction – purchasing a firearm on behalf of someone who cannot legally own one – is known as a "straw purchase." On April 17, 2025, NCCPD Detective Guarino spoke to the store manager of Millers Gun Center, who recalled selling a firearm to Driver on April 4, 2025. (D.I. 10 at 1). The store manager provided the detective with the mandatory firearm transaction record completed by Driver (Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") form 4473) and advised that he thought the sale was "suspicious" because Driver was in the store with two males. (*Id.*). The next step was for officers to interview Driver herself.

On the afternoon of April 17, 2025, Detective Guarino and ATF Special Agent Blank arrived at Driver's residence. Detective Guarino wore a body camera during the interview. The

1

facts below are derived largely from his body camera's video and audio footage.  (*See* D.I. 10, Ex. C (body camera footage)).  There are no material factual disputes between the parties.[1]

The officers were accompanied by a probation officer, who was there to conduct a probation check on another individual who lived at the residence.  (D.I. 10 at 9; D.I. 11 at 2).  An individual opened the front door and let the officers in.  The officers proceeded through a common area to a first-floor bedroom.  After knocking on the bedroom's open door, Detective Guarino entered and greeted Driver.

The officers found Driver lying in bed under a blanket, dressed in loungewear, and watching television.  She sat up shortly after the officers entered but remained in bed during questioning.  Throughout the interview, the officers never physically restrained Driver or told her she was under arrest.

Soon after Detective Guarino entered the bedroom, he was joined by Special Agent Blank. Detective Guarino told Special Agent Blank to "come in here and shut this door . . . he's quite irate out there," referencing noise being made by another resident outside the bedroom.  Special Agent Blank entered and closed the door behind him.  The bedroom was small, and for most of the interview both officers stood near where they entered – Special Agent Blank by the door and Detective Guarino to his left, by the foot of the bed.

The interview began amicably.  Detective Guarino, who led the questioning, was upbeat and friendly.  He asked basic questions about Driver's firearm purchase, framing his inquiries as a routine follow-up.  Driver explained that her living situation was temporary and that she had only

---

[1]    The government explained that "Defense counsel takes the facts set forth in the search warrant affidavit and police report, and as captured in the body worn camera video, as a given. . . . Because there are no material facts disputed, an evidentiary hearing is not necessary."  (D.I. 11 at 1 n.1).  Defense counsel agreed with the government's position on the evidentiary hearing and stated that the Motion raised only "questions of law and not facts."  (D.I. 17 at 2, 7-8, 19).

been staying at this residence for a couple of months. Driver also explained that a friend named "Bucky" was currently holding the gun for her and "teaching [her] about guns." She responded to questions about Bucky's appearance, address, and phone number.

Around the 11-minute mark,[2] the tone of the interview shifted. Detective Guarino's questioning became more pointed. A few examples include:

- "Okay, so listen, hear me out before you start saying anything else, okay? Because we're going down a very steep road right now, okay?"

- "So this is your one and only opportunity to tell us what happened to this gun, okay?"

- "But guess what? That gun is your responsibility. So when it's recovered in a crime, guess whose name comes back to that gun, Payton? Yours."

- "Payton, before you answer this question, hear me out. Before you start to lie to us, it is a state and a federal crime to lie to us right now. Okay?"

Driver made several admissions at this point, including that she had been provided with money to purchase the firearm.

Around 16 minutes in, the officers pulled out Driver's signed ATF form 4473 and suggested that she could be criminally liable for lying on it, stating:

- "And also, it's your responsibility when you sign this form to read all the directions. If you were to go back into the paragraphs in the back of the form and read all the directions, it . . . says you do not have to be under the current use of marijuana the time you purchase the firearm. That's not what it says. It says, do you use it? You do use it. That's another felony."

- "So let me tell you where we're at right now, right? Multiple felonies for lying on this form, right?"

Around 18 minutes in, the interview escalated further. Detective Guarino indicated that if Driver would not cooperate now, she would be handcuffed, taken down to the police station, and charged:

---

[2] References to timing in this Opinion are based on the amount of time that elapsed in the body camera footage provided to this Court. The officers' questioning of Driver began approximately 30 seconds into the footage.

So there's a couple ways we can go about this, right? They're felonies, right? ***I could put you in handcuffs right now and take you down to Newcastle County Police and charge you, right? We could do that and you could go to jail, or we can work on a resolution to how we can get these guns back or identify who you sold these guns to.***

Driver became visibly distressed. She began crying and offered more information to officers. Detective Guarino texted "Shes confessing" (sic) to a number on his phone.

The interview continued for an additional half hour, about 50 minutes in total, as Driver continued to cooperate with the officers. Towards the end of the interview, Detective Guarino said he would "spare [Driver] today and not arrest [her] at the moment," and the officers left without arresting her. At no point during the interview did officers advise Driver of her *Miranda* rights, inform her that she could refuse to speak, or indicate that she was free to terminate the encounter or leave the room.

On November 13, 2025, Driver was indicted under Title 18, United States Code, Sections 922(a)(6) and 924(a)(2) for allegedly unlawfully purchasing a firearm on another person's behalf. (D.I. 2).

## II.    LEGAL STANDARD

### A.    *Miranda* **Warnings**

When a suspect is interrogated in government custody, the suspect should be "warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him." *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). These are called *Miranda* warnings. When *Miranda* warnings are due but not given, the prosecution's case in chief cannot rely on statements made by the defendant during the interrogation. *See Harris v. New York*, 401 U.S. 222, 224 (1971).

To establish whether a suspect is "in custody" – a term of art – courts in this Circuit must first consider "the circumstances surrounding the interrogation." *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019) (quoting *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005)). Then, courts must ask "as an objective matter, whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave" – that is, whether there was "restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (cleaned up). This "freedom-of-movement test" is, however, "a necessary and not a sufficient condition for *Miranda* custody." *Howes v. Fields*, 565 U.S. 499, 509 (2012). Courts must ask the "additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* If these questions are answered in the affirmative, *Miranda* warnings were required. *Id.*

**B.      Voluntariness**

Whether or not *Miranda* warnings were required, this Court must consider whether the Defendant's statements were voluntary. *Ludwikowski*, 944 F.3d at 135. A defendant's involuntary statements that amount to "compelled self-incrimination" are inadmissible, and evidence obtained because of those statements is likewise generally inadmissible. *See United States v. Patane*, 542 U.S. 630, 639 (2004); *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). Voluntary statements provided in the absence of required *Miranda* warnings are inadmissible in the prosecution's case in chief; but such statements can be used to impeach a defendant's testimony at trial, and evidence obtained as a result of such testimony may be admissible at trial. *Patane*, 542 U.S. at 639.

The government has the burden to prove by a preponderance of the evidence that the defendant's statements were voluntary – that is, "the product of an essentially free and unconstrained choice." *Ludwikowski*, 944 F.3d at 135 (quoting *United States v. Swint*, 15 F.3d

5

286, 289 (3d Cir. 1994)).  "[C]oercive police activity" is a prerequisite to an involuntariness finding.  *Id.*  Courts consider indicators such as "the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep." *Id.* (citations omitted).  Courts also consider the defendant's individual characteristics, including "youth," "lack of education," "low intelligence," "background and experience," "prior dealings with the criminal justice system," and whether the defendant received "any advice" regarding "constitutional rights."   *Id.* (citations omitted).   The "ultimate question" is "whether the defendant's will was overborne when he confessed." *Id.* (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 304 (3d Cir. 2014)).

## III.    **DISCUSSION**

### A.    **Whether the Defendant was Entitled to *Miranda* Warnings**

This Court is faced with the question of whether – and if so, when – Driver was entitled to *Miranda* warnings during her interrogation[3] on April 17, 2025.  The answer hinges on whether Driver was "in custody," which depends on whether a reasonable person in Driver's circumstances would have felt free to terminate the interrogation and whether Driver was subject to coercive pressures that rose to the level of station house questioning.  *See Ludwikowski*, 944 F.3d at 131.

This Court's analysis is framed by considerations that the Third Circuit has deemed relevant, including "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones, display of weapons, or physical

---

[3]    There is no legitimate dispute that the April 17 interview was an "interrogation."  *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (providing that an "interrogation" for purposes of *Miranda* extends to "express questioning" and its "functional equivalent," including words and actions that "the police should know are reasonably likely to elicit an incriminating response from the suspect").  The body camera footage reveals that officers thoroughly questioned Driver with the intention of extracting incriminating information about her and others.

restraint; and (5) whether the suspect voluntarily submitted to questioning." *United States v. King,* 604 F.3d 125, 138 (3d Cir. 2010) (quoting *United States v. Willaman,* 437 F.3d 354, 359-60 (3d Cir. 2006). Other relevant considerations include whether officers conveyed their belief that the suspect was guilty and whether the suspect agreed to meet with police for questioning. *See Ludwikowski,* 944 F.3d at 132 (citing *Jacobs,* 431 F.3d at 105).

Start with the physical surroundings. Driver was approached while in bed and remained there for the course of the interview. The officers stood near the foot of her bed, with Special Agent Blank standing in front of the bedroom door he closed after entering. The officers never offered Driver the chance to get up or move the questioning elsewhere. Driver argues that this indicates a custodial interrogation. (D.I. 10 at 7-8).

The government sees things differently. It highlights that the officers never physically restrained or threatened Driver. (D.I. 11 at 7-10). The officers also did not command Driver to stay in bed or summon her to the police station. (*Id.*). Further, the government stresses the door was shut for a practical reason that Detective Guarino explained out loud in the presence of Driver – the "irate" noise emanating from elsewhere in the residence.[4] (*Id.* at 6-7).

The truth is somewhere in the middle. The Court agrees with the government that, under the unique circumstances here, the initial closing of the door does not strongly suggest a custodial interrogation. The defense is certainly correct Driver was in a vulnerable position: lying in bed, watching television in a small room, and caught off-guard by the sudden presence of two male law enforcement officers. But the officers simply questioned Driver where they found her. There was

---

[4]    The government also notes that Driver was questioned in her home, which is "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *See Willaman*, 437 F.3d at 360 (citation omitted). (D.I. 11 at 7). But Driver was transient, living alone in a borrowed bedroom for just a couple months prior to the interrogation (apparently with roommates on probation). Here, Driver's "home" was not a particularly non-coercive environment.

also nothing that prevented Driver from requesting initially that the interview proceed elsewhere in the residence.  Ultimately, this Court will not impose an affirmative duty on officers to offer that bedroom interviews may continue in the living room; this may be polite, but it is not an appropriate legal standard.[5]

Other considerations cut both ways.  The length of questioning here (50 minutes) weighs mildly against the necessity of *Miranda* warnings because, although this was no passing conversation, the interrogation is far shorter than the length of other interviews the Third Circuit has deemed non-custodial.  *See United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) (interview "lasting several hours" was non-custodial); *Ludwikowski*, 944 F.3d at 132 (seven-hour interview was non-custodial).  Other circumstances weigh somewhat in favor of *Miranda* warnings.  These include that Driver was approached by officers without warning, did not voluntarily submit to questioning, and was not told that she was not under arrest.

So far, then, the circumstances discussed above demonstrate that Driver faced some coercive pressure from her vulnerable physical position.  But they do not, without more, establish that Driver was owed *Miranda* warnings.  This Court therefore turns to whether the officers' interrogation tactics tip the scales.

The interrogation was a crescendo.  It began cordially, but around 10 minutes in the tone shifted.  The officers began asking Driver pointed and aggressive questions.  Around 16 minutes, the officers confronted Driver with her signed firearm purchase form and accused her of illegally

---

[5]     There is some dispute over whether police "displayed" their weapons.  *See King*, 604 F.3d at 138 (noting this is a relevant consideration).  Defendant avers that Detective Guarino was wearing tactical gear – likely including a weapon – which Driver would have seen. (D.I. 10 at 9).  The government does not dispute this but argues that the officers were not "displaying" their guns in the sense that they were not waiving or holding up their guns. (D.I. 17 at 18-19).  Under these circumstances, this Court finds that this fact weighs neither for nor against the necessity of *Miranda* warnings.

lying on it.  Then, just after the 18-minute mark, the interrogation crossed the line.  Detective Guarino explained where things stood and offered a stark choice:

> I could **put you in handcuffs** right now and take you down to Newcastle County Police and **charge you**, right? We could do that and **you could go to jail, or we can work on a resolution** to how we can get these guns back or identify who you sold these guns to.

The point was clear: talk now or be arrested and charged.  Driver thus faced severe, near-certain consequences if she failed to cooperate.

To a reasonable person approached in bed, with her bedroom door closed, facing increasingly intense and accusatory questions, the choice offered by officers – to cooperate or face charges – would make clear that she was not free to leave.[6]  Likewise, a reasonable person in this circumstance would feel subject to at least the same level of coercive pressure that a suspect would feel in a standard station house interview.

This Court thus holds that *Miranda* warnings were warranted by the 18-minute mark (specifically 18:22, when the relevant question begins), after which the government cannot use Driver's statements in its case in chief.[7]

### B.      Whether the Defendant's Statements were Voluntary

The parties dispute whether Driver's statements during the April 17 interrogation were voluntary.  The voluntariness analysis requires review of the "totality of the circumstances." *Halsey*, 750 F.3d at 304.  Many of these circumstances have been discussed already, and so the

---

[6]     The government relies heavily on *Ludwikowski* to reach the opposite conclusion. *See* 944 F.3d at 130-35.  There, the Third Circuit held that *Miranda* warnings were not necessary in the context of a much longer interrogation that took place behind a closed door in a police station. *Id.*  But *Ludwikowski* turned in large part on the unique fact that the defendant voluntarily initiated the police interview – "simultaneously tr[ying] to get help and conceal his own wrongdoing." *Id.* at 134.  No similar circumstances are present here.

[7]     The government agrees, as it must, that once this Court deems the interrogation became custodial, subsequent events did not render it non-custodial. (D.I. 17 at 16).  A reasonable person would doubtless remember the threat of jail, handcuffs, and charges for the rest of the interrogation.

Court will not reiterate them in full.  In short, although Driver was never physically restrained, she was approached by police in a relatively vulnerable position and faced increasingly aggressive questioning that culminated in the threat of criminal charges if she failed to cooperate.

Driver's individual characteristics also matter for the voluntariness analysis.  *Ludwikowski*, 944 F.3d at 135.  Driver had no prior criminal history or experience with law enforcement, and she had never previously been advised of her *Miranda* rights.  (D.I. 10 at 15).  That said, Driver was 27 years old at the time of the interrogation, and she appeared to be capable of understanding the officers' questions and responding to them clearly.  (*See* D.I. 11 n.5).  Driver was, in sum, neither particularly experienced with the criminal justice system nor particularly susceptible to coercion from law enforcement.

The Third Circuit has explained that only "special circumstances" present in an "outlier" case will justify suppressing a suspect's statements on voluntariness grounds when the suspect is not in custody.  *Ludwikowski*, 944 F.3d at 135.  This is not such an unusual case.  Driver was not a uniquely vulnerable individual, and although she faced some intense questioning, the officers did not suggest that she must cooperate – or else face consequences – until over 18 minutes in. *See Halsey*, 750 F.3d at 304 (a statement "is not rendered involuntary simply because the police procured it by using psychological tactics").  Surely Driver, as with most individuals, would not "feel impelled to confess to the police purely of [her] own accord, without any questioning at all." *See Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986).  But the bar is higher: a defendant's will must be truly "overborne" to justify a finding of involuntariness.  *See id.*  In the early portion of this interrogation, that high bar is not met.

As explained in this Court's *Miranda* analysis, the officers' statements around 18 minutes in change the picture.  The officers present Driver with a choice between cooperation and handcuffs, charges, and jail.  Together with pre-existing circumstances – including Driver's

position in bed, the closed door, and accusatory questions – this renders Driver's post-18-minute statements involuntary. This conclusion is reinforced by Driver's visible distress following the 18-minute question and Detective Guarino's subsequent text message that Driver was "confessing."

All this happened without reading Driver her *Miranda* rights, which is an important consideration in the voluntariness analysis. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver."); *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) ("Before petitioner made any incriminating statements, he received partial warnings of his constitutional rights; this is, of course, a circumstance quite relevant to a finding of voluntariness."); *Miller*, 796 F.2d at 609 (*Miranda* warnings provided to a suspect suggested his statements were voluntary). The government is on much firmer ground when defendants are fully informed of their rights and nonetheless decide to speak with police. Driver, however, was never informed of her *Miranda* rights, and so she was more susceptible than a fully-informed suspect to aggressive interrogation tactics.

Therefore, this Court finds that Driver's statements prior to the 18-minute mark during the April 17 interrogation were voluntary, whereas her statements after the 18-minute mark were not. The government thus may not use Driver's post-18-minute statements in any capacity at trial.

### C.    Suppression of the Firearm

Evidence discovered by the government due to a defendant's involuntary statements must also be suppressed. *Patane*, 542 U.S. at 639. Here, Driver moves to suppress the firearm seized by law enforcement on May 1, 2025, arguing that the warrant for the search that uncovered the firearm was based largely on her involuntary statements. (*Id.* at D.I. 10 at 1, 15-16). At oral argument, the government conceded this point. (D.I. 17 at 29). The government represented that

11

a "critical component" of the warrant was the address provided by Driver in the "latter half of the interview"; and "without that critical information, the warrant would not have the support it needed." (*Id.*). This Court will thus suppress the firearm.

## IV.    **<u>CONCLUSION</u>**

Therefore, this Court will grant Driver's Motion to the extent that (i) the firearm seized on May 1, 2025 will be suppressed, and (ii) Driver's statements April 17, 2025 after the 18-minute mark in the footage provided to this Court (D.I. 10, Ex. C) will be suppressed.